UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14 C 9485 |
| ) | |
| CHARLES STOKES (78869-004), ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Charles Stokes ("Stokes") was convicted by a federal jury in June 2010 on a charge of traveling in foreign commerce for the purpose of engaging in a sex act with a minor, a violation of 18 U.S.C. § 2423(b). He was sentenced to 180 months in prison, the statutory maximum. Stokes has moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. He presents six alleged bases for relief: (1) counsel was ineffective because he had insufficient time to prepare for trial; (2) the prosecutors engaged in "knowing use of false testimony"; (3) the indictment was constructively amended at trial; (4) this court lacked jurisdiction to hear the charges against him; (5) the court improperly applied U.S.S.G. § 2G2.1 in his case; and (6) the court "did not consider the defendant[']s 3553(a) factors." Stokes has also moved for the court to recuse [8] from reviewing his § 2255 motion on the basis of bias. For the reasons explained here, the motion for recusal [8] is denied, and Stokes's § 2255 petition [1] is dismissed. The court declines to grant a Certificate of Appealability on any issue.

## BACKGROUND

Except where noted, the following facts are drawn from the Seventh Circuit's opinion affirming Petitioner's conviction and sentence. *United States v. Stokes*, 726 F.3d 880, 885–87 (7th Cir. 2013).

## I. Factual Background

Stokes served as a teacher in Florida's Miami-Dade public-school system for more than a decade. In February 2000, Stokes pleaded no contest to a charge of misdemeanor battery for indecent touching of two of his male students. A Florida court suspended Stokes's sentence and placed him on probation. Shortly thereafter, Stokes requested—and was granted—permission to complete his probation in Thailand. Less than a month after entering his guilty plea, Stokes moved to Thailand, settling in the city of Pattaya, approximately 90 miles southeast of Bangkok on the Gulf of Thailand.

Within two weeks of touching down in his new home, Stokes began seeking out boys for sex. His modus operandi involved enticing runaways and other boys from the streets to his home, ostensibly to play video games. But, once there, Stokes would engage in sex acts with them, often memorializing those acts with a digital camera. During his time in the country, he also frequently hired young male prostitutes. This behavior continued undetected for several years. Outside of a three-week trip to the United States starting in late December 2001, Stokes resided continuously in Thailand from March 2000 until his extradition in 2007. While there, he supported himself by teaching English as a second language.

In December 2002, Immigration and Customs Enforcement ("ICE") agents based in Thailand received a tip that Stokes had been fired from a teaching job in Bangkok for indecently touching male students. The agents opened an investigation and learned that this was the second time that Stokes had been dismissed from a Thai school for similar allegations. Based on this information, ICE sought the help of the Royal Thai Police. Thai officers eventually obtained a warrant authorizing a search of Stokes's home "to locate and seize any illegal items." (Search Warrant, Ex. 3 to Def.'s Mem. in Support of Mot. to Suppress, R. 108, *United States v. Stokes*, No. 07 CR 590, N.D. Ill.)

Early in the morning of October 9, 2003, ICE agents and the Royal Thai Police executed the warrant at Stokes's home. They recovered a digital camera, multiple compact discs, and a

computer. The devices contained, in total, more than 6,000 images of Stokes's sexual encounters with adolescent and prepubescent boys.

## II. Procedural History

Despite the voluminous evidence recovered by authorities, Stokes was not arrested until July 2006, nearly three years after the search. Another year passed before Thailand granted the United States' extradition request and Stokes returned to Miami to face a charge of violating 18 U.S.C. § 2423(c). That provision makes it a crime for U.S. citizens and lawful permanent residents to travel in foreign commerce and engage in illicit sexual conduct. As prosecutors soon realized, however, that particular subsection of § 2423 was not enacted until *after* Stokes had departed the United States for Thailand and therefore did not apply to his conduct. Prosecutors dropped that charge, but Stokes was transferred to the Northern District of Illinois where he was indicted on three counts of violating 18 U.S.C. § 2251A(b)(2)(A), a child-trafficking statute. Prosecutors later dismissed these charges as well, however, and finally indicted Stokes on a single count of violating 18 U.S.C. § 2423(b), which at the time of Stokes's March 2000 emigration to Thailand prohibited traveling in interstate or foreign commerce for the purpose of engaging in a sexual act with a person under 18. *See* 18 U.S.C. § 2423(b) (effective Oct. 30, 1998 to Nov. 2, 2002).

Stokes moved to suppress the evidence recovered in the 2003 search of his home in Thailand. This court denied the motion, *United States v. Stokes*, 710 F. Supp. 2d 689 (N.D. Ill. 2009), and the case proceeded to trial before a jury. At trial, the government introduced testimony from the ICE agents involved in the investigation and from two Thai boys who were sexually assaulted by Stokes. One of the victims was a "street kid nicknamed 'Ice'," who was 11 years old when Stokes first lured him to his home. 726 F.3d at 887. Ice testified that Stokes subjected him to various sex acts and gave him money on some 20 different occasions. The other victim, nicknamed "Note," also was 11 when he first went home with Stokes. He testified to a similar pattern of sexual abuse perpetrated by Stokes.

3

Finally, the government introduced a representative sample of the 6,000 photographic images recovered during the search of Stokes's home. The photographs depicted Stokes engaged in various sex acts with Thai boys, including Ice and Note. An ICE agent testified that approximately 70 different boys appear in the images, 60 of whom appeared to be under 16. Of those, half appeared to be under the age of 12, and the youngest looked to be about 7. Hundreds of these photos were transferred from Stokes's camera to compact discs in the months immediately before and after his brief trip to the United States at the end of 2001.

The jury found Stokes guilty and this court sentenced him to the statutory maximum penalty of 15 years in prison. The Seventh Circuit upheld both the conviction and sentence on appeal. Stokes filed this § 2255 motion [1] in November 2014, raising five different grounds for relief. He later added a sixth [6]. He has also asked this court to recuse itself from the consideration of his § 2255 motion [8]. The government filed a response [16] to which Stokes has replied [20].

## **DISCUSSION**

**I. Motion to Recuse**

Stokes argues that this court should recuse itself from consideration of his § 2255 motion based on "the fervent possibility [of] personal bias and prejudice." (Mot. for Recusal, R. 8, at 1.) In support of his motion, Stokes points to several comments made by this court throughout Stokes's trial and sentencing as well as statements made by the court in an unrelated case involving a different defendant charged with a similar crime. (*Id.* at 2–12.)

Section 455(a) of the Judicial Code, 28 U.S.C. § 455(a), requires a judge to disqualify herself in any proceeding in which her impartiality might reasonably be questioned. Section 455(b)(1) requires disqualification when the judge has an *actual* personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts. Stokes's motion to recuse invokes both theories.

4

### A. Section 455(a)

The relevant question for purposes of § 455(a) disqualification is whether "the judge's impartiality might reasonably be questioned by a well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 988 (7th Cir. 2001) (internal quotation marks and citation omitted). The standard is an objective one: "That an unreasonable person, focusing on only one aspect of the story, might perceive a risk of bias is irrelevant. . . . [A] reasonable person is able to appreciate the significance of the facts in light of relevant legal standards and judicial practice and can discern whether any appearance of impropriety is merely an illusion." *In re Sherwin-Williams Co.*, 607 F.3d 474, 477–78 (7th Cir. 2010).

### B. Section 455(b)(1)

The appropriate standard of proof for a claim of recusal predicated on *actual* prejudice is similar: "whether a reasonable person would be convinced that the judge is biased." *United States v. Balistrieri*, 779 F.2d 1191, 1201 (7th Cir. 1985). To justify recusal under this theory, a party must file an affidavit that includes definite and particular facts about circumstances that would convince a reasonable person that the judge is prejudiced. *Tezak v. United States*, 256 F.3d 702, 717 (7th Cir. 2001) (citing 28 U.S.C. § 144). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Rather, "[b]ias against a litigant must . . . arise from an extrajudicial source." *Hook v. McDade*, 89 F.3d 350, 355 (7th Cir. 1996). Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated antagonism that would make fair judgment impossible. *Liteky*, 510 U.S. at 555.

The Seventh Circuit has stated that "the negative bias or prejudice from which the law of recusal protects a party must be grounded in some personal animus or malice that the judge harbors against him, of a kind that a fair-minded person could not entirely set aside when

5

judging certain persons or causes." *Balistrieri*, 779 F.2d at 1201.  Further, "the disqualification of a judge for actual bias or prejudice is a serious matter, and it should be required only when the bias or prejudice is proved by compelling evidence." *Id.*  By the same token, recusal is not a tool that parties can arbitrarily invoke.  Judges have an obligation *not* to recuse themselves in those cases in which they are qualified to sit.  *See Laird v. Tatum*, 409 U.S. 824, 837 (stating that "a Federal judge has a duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified*" (emphasis in original)).

        **C.**        **Stokes's Allegations of Prejudice**

Stokes's allegations of bias focus on three sets of comments made by the court.  First, he points to statements the court made during the sentencing of Donald McGuire, who was also convicted in this court of traveling in interstate and foreign commerce for the purpose of having sex with a minor.  Second, he objects to comments made by the court during a hearing on August 4, 2009.  And third, he takes issue with a series of rulings and in-court statements made by the court during his trial.

                **i.**        **The *McGuire* Case**

Stokes objects to the following quote published in the *Chicago Tribune* after McGuire's sentencing: "'I want any such person to know the system of justice, and this judge personally, finds it absolutely abhorrent,' the judge said of McGuire's misconduct. He committed 'a very, very serious sin,' she said." *Id.*  Although Stokes implies that the court made these comments about the *McGuire* case to the media, (R. 8 at 2–3 ("[T]his Court made public its feelings recording its personal revulsion, both in Court and in the press . . . .").), the statements in question were made at McGuire's sentencing and subsequently published in a newspaper article.  *See* Jeff Coen, *Former Priest, 78, Gets 25 Years on Abuse Charges*, Chicago Tribune, Feb. 12, 2009, http://articles.chicagotribune.com/2009-02-12/news/0902111018_1_abuse-charges-sentencing-guidelines-priest.  This distinction is material, as statements made to the media about a pending case may justify recusal, *In re Sherwin-Williams Co.*, 607 F.3d at 478

6

(discussing cases in which "recusal has been ordered because of a district judge's comments to the media [where] the commented-upon-case was pending before the district judge"), while in-court statements seldom do, *Liteky*, 510 U.S. at 555 (holding that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion") (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

The court's comments were not improper in McGuire's case, *see Liteky*, 510 U.S. at 541 ("Even though a federal judge who presides at a criminal trial may, upon completion of the evidence, be exceedingly ill disposed towards a defendant, who has been shown to be a thoroughly reprehensible person, the judge is not thereby recusable . . . for bias or prejudice."), and they have no bearing on Stokes's. Petitioner has not presented any evidence connecting this court's statements about McGuire to any personal malice or animus toward Stokes. As a result, those statements do not justify recusal.

### ii. August 4, 2009 Hearing

Stokes next urges the court to recuse itself based on the following remarks from an August 2009 status hearing, remarks which he argues "revealed an air of prejudice and exposed a bias toward a select group of people." (R. 8 at 3) Specifically, addressing the argument that a search for drugs could not reasonably have led to discovery of photographs, the court observed:

> There are drugs that are known to be used by homosexuals, and maybe this is one of those drugs. . . . So the agents go into the home looking for evidence of that—of the use of that drug. They know that it's popularly used by homosexuals. They know that male sexual activity, boys, could be involved. It doesn't strike me as a huge stretch to say, what's on the camera? I guess I am just saying that, apart from the scope of the warrant argument, I am not sure that it jumps off the page at me that looking into a camera in a situation like that is unreasonable.

(Aug. 4, 2009 Hearing Tr., R. 305, at 20–21, *United States v. Stokes*, No. 07 CR 590, N.D. Ill.) Stokes goes on to claim that "[t]his line of reasoning is insulting and displays the Court[']s prejudice and disgust toward someone accused of such a crime." (R. 8 at 3.)

7

These comments do not reflect insult or disgust. In support of his motion to suppress, Stokes argued characterized the Thai warrant as a "drug warrant" and that the search for photographic and video evidence in Stokes's home exceeded the scope of the warrant. (Mot. to Suppress, R. 59, at 2–3, *United States v. Stokes*, No. 07 CR 590, N.D. Ill.) The court ultimately concluded that the Warrant Clause of the Constitution does not apply to an extraterritorial search, such as this one, and that the circumstances of the search were otherwise reasonable. *Stokes*, 710 F. Supp. 2d at 698-702. The Court of Appeals affirmed both of those determinations. *Stokes*, 726 F.3d at 890-94. Taken in context, in its remarks from the bench, the court was simply recognizing that the circumstances could be understood as supporting the reasonableness of the officials' conduct. But regardless of their context, nothing in the court's remarks would cause a reasonable person to question the court's impartiality. Nor do the comments support Stokes's claim that the court held personal or extrajudicial biases against Stokes or others accused of similar crimes. As such, the statements in question do not warrant recusal.

### iii. Statements Made During Stokes's Trial

Finally, Stokes contends that recusal is warranted based on numerous incidents at trial and sentencing that allegedly exposed the court's prejudice against him. For instance, Stokes points to multiple rulings made in the government's favor (R. 8 at 4–12), and references by the court to Stokes's previous legal trouble in Florida (*id.* at 3–4), as evidence of the court's bias against him.

The Supreme Court has noted that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," *Liteky* 510 U.S. at 555. This case is no exception. To support his claims, Stokes must offer facts that are sufficiently specific to convince a reasonable person that bias—or at least the appearance of bias—exists. *Tezak*, 256 F.3d at 717 (7th Cir. 2001). Stokes has offered no such facts. Instead, he relies on the inference that because the court was (in Stokes's estimation) "terse" with defense counsel and ruled against Petitioner on

8

certain issues (R. 8 at 4–9), the court must have harbored personal, extrajudicial animus against him. That inference is not enough to justify recusal. And the argument ignores the many instances in which this court ruled on motions in Stokes's favor. (Resp't's Br., R. 16, at 18–19 (listing orders ruling in Stokes's favor)). Petitioner's motion to recuse [8] is denied.

## II.     28 U.S.C. § 2255 Motion

Pursuant to 28 U.S.C. § 2255, a prisoner sentenced in violation of the Constitution or laws of the United States "may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a); *Swanson v. United States*, 692 F.3d 708, 714 (7th Cir. 2012). A petition for relief under § 2255 requests an extraordinary remedy, essentially asking the district court to "reopen the criminal process to a person who has already had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). In reviewing such a petition, the district court need not conduct an evidentiary hearing and may dismiss the petition without a hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

As outlined above, Stokes has raised six separate grounds in support of his § 2255 motion. The court addresses his six arguments below.

### A.     Ineffective Assistance of Counsel

Stokes's first claim for § 2255 relief is that he was denied the effective assistance of counsel. Specifically, Stokes claims that his trial attorney, Pablo de Castro, had insufficient time to mount an adequate defense because he was appointed "just 90 days prior to trial" and the court denied his request for an extension of time. (R. 1 at 6.) Due to these time constraints, Stokes contends that de Castro could not (1) "engage in meaningful/necessary investigation or analysis of discovery or witnesses," or (2) "fully review[] and analyz[e] the evidence prior to trial." (*Id.*)

In order to establish constitutionally ineffective assistance of counsel, the petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness" and

(2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). To satisfy the performance prong of the *Strickland* test, Stokes must direct the court to specific acts or omissions of counsel. *See United States v. Trevino*, 60 F.3d 333, 338 (7th Cir. 1995). The court must then consider whether, in light of all the circumstances, counsel's performance was outside the range of professionally competent assistance. *Id.* Meanwhile, in order to satisfy the prejudice prong, Stokes must "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A court need not address both prongs of the *Strickland* test if one provides the answer. *See United States v. Fudge*, 325 F.3d 910, 924 (7th Cir. 2003) (citing *Matheney v. Anderson*, 253 F.3d 1025, 1042 (7th Cir. 2001)).

The court will focus exclusively on *Strickland*'s prejudice prong, because it proves dispositive here. Stokes lists a number of things that de Castro might have done with additional time to build a defense. For instance, he could have (1) "create[d] timetables, graphs and charts showing exactly the frequency (or infrequency) of the defendant's meetings with prostitutes" (R. 1 at 9); (2) interviewed more "potential witnesses" (*id.* at 11); and pursued "legitimate concerns or potential defenses." (*id.*). But Stokes does not explain how any of this additional legwork could have affected the jury's determinations. For instance, how would the timelines, graphs, or charts that Stokes suggests have cast doubt on the government's case? What testimony would additional witnesses have offered? And what potential defense could de Castro have raised? Stokes answers none of these questions. Instead, he simply names a laundry list of things that his attorney could have done, without any explanation as to how they would have altered the result of his trial. This failure is particularly damning in light of the evidence against Stokes, which the Seventh Circuit characterized as "overwhelming." *Stokes*, 726 F.3d at 897. Without establishing a reasonable probability that the outcome of the

proceedings would have been different if not for the time constraints put on his trial counsel, Stokes cannot prevail on his ineffective-assistance claim.

### B. Knowing Use of False Testimony

Stokes next argues that his conviction should be vacated because the government knowingly introduced false testimony against him. (R. 1 at 18–20.) A conviction obtained through the knowing use of false testimony violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To obtain a new trial, however, a petitioner must establish that: (1) there was false testimony; (2) the prosecution knew or should have known that it was false; and (3) there is a likelihood that the false testimony affected the judgment of the jury. *Morales v. Johnson*, 659 F.3d 588, 606 (7th Cir. 2011). For purposes of this analysis, the Seventh Circuit has distinguished between "mere inconsistencies" in a witness's testimony, *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990), and "the willful assertion under oath of a false, material fact." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984).

Stokes offers dozens of citations to the record in support of his assertion that the government knowingly introduced witnesses who testified falsely. (R. 1 at 12-17.) The majority of these references are simply page and line numbers without additional information regarding the content or alleged contradiction revealed at the record citation. And at least some of the few passages purportedly quoted by Stoke are in fact actually paraphrases or mischaracterizations of the actual trial testimony. (*See, e.g., id.* at 12 (offering quotes attributed to law-enforcement officials that inaccurately reproduce the record).)

In any event, none of the evidence that Stokes offers supports the notion that any witness for the prosecution offered perjured testimony. At most, Stokes has identified mere inconsistencies that do not substantiate his claim that government witnesses "did invent, fabricate, or perjure themselves during pre-trial and trial proceedings." (R. 8 at 12.) One example is illustrative of this failing. Stokes takes issue with the testimony of ICE Agent Gary Phillips. At trial, Phillips explained that he had identified the boy known as "Note" as "under 12"

years of age based on physical observations rather than any formal medical or physical examination. (R. 1 at 13–14; June 7, 2010 Trial Tr., R. 288, at 97–98, *United States v. Stokes*, No. 07 CR 590, N.D. Ill.) Stokes contends that this testimony contradicts an investigation report that stated "On January 30, 2004, C.A. Bangkok with assistance of [Phillips], conducted an interview and x-ray examination of [Note]." (R. 1 at 14.) The report is vague as to Phillips's precise role in the x-ray examination. Even assuming he played a substantial role, however, his testimony is not obviously inconsistent with that activity, let alone false. In his testimony, Phillips did not offer a blanket denial of having ever performed any medical tests on Note; he simply stated that his assessment of the boy's age was not based on any formal examination.

Moreover, even if some of the testimony cited by Stokes did show that government witnesses offered non-truthful testimony, he has not offered any evidence that the government was or should have been aware of the untruths. Nor has he presented any basis for the conclusion that the allegedly false testimony prejudiced him. As Stokes has failed to satisfy any of the three factors required to support his contention that the prosecution knowingly introduced false testimony, this claim fails.

### C. Constructive Amendment of the Indictment

Stokes's third ground for relief is that the government "constructively amended" the indictment at trial, "convicting the defendant of acts he did outside the scope of the indictment." (R. 1 at 18.) More specifically, he claims that the government failed to introduce any evidence of Stokes's intent in traveling to Thailand—a necessary element of § 2243(b)—and instead presented evidence of the sex acts that Stokes engaged in after his arrival for the purpose of "inviting the jury to transfer its revulsion . . . into a conviction for travel with intent." (*Id.*)

As the government points out, Stokes already litigated this claim on direct appeal and lost. In fact, this section of Stokes's § 2255 motion is largely a rehashing of his appellate brief on direct review. (*Compare* R. 1 at 19 ("[N]o evidence was presented of the defendant[']s purpose for initiating his travel.") *with* Appellant's Br., R. 14, *United States v. Stokes*, No. 11-

2734, 7th Cir. ("There was no evidence of the defendant's purpose for initiating the travel.")) The Seventh Circuit described challenge on this issue as "frivolous," explaining that "Stokes's sexual abuse of young boys both before and after his travel to Thailand was directly and centrally relevant to his intent at the time of his travel." *Stokes*, 726 F.3d at 896. As this argument was considered and rejected on appeal, Stokes may not relitigate it in this collateral proceeding. *See Fuller v. United States*, 398 F.3d 644, 648 (7th Cir. 2005) ("[O]nce this court has decided the merits of a ground of appeal, that decision establishes the law of the case and is binding on a [court] asked to decide the same issue in a later phase of the same case, unless there is some good reason for reexamining it.") (quoting *United States v. Mazak*, 789 F.2d 580, 581 (7th Cir. 1986)); *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004) ("[T]he courts . . . forbid a prisoner to relitigate in a collateral proceeding an issue that was decided on his direct appeal.").

### D. Jurisdictional challenge

Next, Stokes argues that this court "did not have proper jurisdiction to address the charged offense" and, therefore, "the Court should enter an order to annul, vacate or set aside judgment." (R. 1 at 24.) Like his constructive-amendment argument, Stokes has raised this one before. On direct appeal, Stokes similarly claimed that the Rule of Specialty[1] barred his prosecution because he was extradited for a violation of 18 U.S.C. § 2423(c) but convicted under § 2423(b). The Seventh Circuit ruled that, because Thailand was alerted to the modified charges against Stokes and subsequently waived the Rule of Specialty, Stokes's conviction did not run afoul of the doctrine. *United States v. Stokes*, 726 F.3d 880, 888 (7th Cir. 2013).

---

[1] A doctrine of treaty law, the Rule of Specialty stands for the proposition that an extradited individual can only be prosecuted for the specific crime(s) for which he was extradited. *United States v. Warda*, 285 F.3d 573, 575-76 (7th Cir. 2002) ("[T]he Rule of Specialty ... does not allow the country to which an individual is extradited to prosecute that person for a crime unless the extraditing nation has expressly authorized such a prosecution.").

13

Because Stokes raised this argument on direct appeal, he cannot relitigate it on collateral review. *See Fuller*, 398 F.3d at 648; *White*, 371 F.3d at 902.

### E. Cross Reference to § 2G2.1

Stokes's fifth ground supporting his § 2255 motion is that the court should not have applied U.S.S.G. § 2G2.1 in determining Stokes's sentence, because none of the relevant conduct took place in the United States. (R. 1 at 25-27.)

Because this argument was available to him on direct appeal, Stokes should have raised it then. His failure to do so constitutes a procedural default, barring him from raising the claim in his § 2255 petition unless he can show (1) cause for the default and (2) actual prejudice caused by the failure to appeal. *See Belford v. United States*, 975 F.2d 310, 313 (7th Cir. 1992).

Even apart from the procedural default, the court must dismiss this claim because it lacks merit. The Seventh Circuit rejected a similar argument almost two decades ago in *United States v. Dawn*, 129 F.3d 878, 886 (7th Cir. 1997). In *Dawn*, as in Stokes's case, the defendant received a higher sentence under the cross-referenced § 2G2.1, the child pornography production guideline. Dawn, who was convicted of *possession* of child pornography, argued that the district court erred in applying § 2G2.1, because any films depicting minors in sexually explicit conduct would have been *produced* abroad. *Id.* at 881. The Seventh Circuit rejected this line of reasoning, reiterating that the Sentencing Guidelines are designed to consider conduct beyond the offense of conviction:

> [T]aking into account conduct related to the offense of conviction in sentencing is not the same thing as holding the defendant criminally culpable for that conduct. . . . However much it may look like the defendant is being sentenced for a different offense—and the cross-referencing provisions of the Guidelines often make it appear very much as though he were—he is actually being sentenced solely for the crime or crimes of which he was convicted."

*Id.* at 884 (citations omitted).

The court went on to note that "sentencing judges may look to the conduct surrounding the offense of conviction in fashioning an appropriate sentence, regardless of whether the defendant was ever charged with or convicted of that conduct, and regardless of whether he could be." *Id.* at 886. Thus, the fact that the conduct relevant to U.S.S.G. § 2G2.1 occurred exclusively abroad was "immaterial" to that Guideline's applicability at Dawn's sentencing. *Id.*

The Seventh Circuit's reasoning in *Dawn* dooms Stokes's argument here. Regardless of the location where Stokes created sexually explicit visual or printed material, § 2G2.1 was applicable in determining his appropriate sentence under the Sentencing Guidelines.

**F. Section 3553 Factors**

Finally, Stokes challenges his sentence on the theory that this court failed to "consider [his] 3553(a) factors as a primary guide at sentencing." (Amendment to § 2255 Motion, R. 6, at 1.) Like his argument regarding the extraterritorial applicability of U.S.S.G. § 2G2.1, Stokes has procedurally defaulted this claim by failing to raise it on direct appeal. *See Belford*, 975 F.2d at 313. But it, too, fails on its merits.

After calculating a defendant's sentencing range under the advisory guidelines, district courts must "hear the arguments of the parties and conclude by making an individualized assessment of the appropriate sentence based on the § 3553(a) factors." *United States v. Booker*, 612 F.3d 596, 601 (7th Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 49-50 (2007)). Ultimately, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50.

Although the court did not explicitly cite to the § 3553 factors at sentencing, it need not do so, so long as it "gives meaningful consideration to the factors . . . and arrives at a sentence that is objectively reasonable." *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008); *see also United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005) ("[T]he sentencing judge can

15

discuss the application of the statutory factors to the defendant not in checklist fashion but instead in the form of an adequate statement of the judge's reasons.").

The court's "meaningful consideration" of the § 3553 factors here is evident from an examination of the transcript of Stokes's sentencing. For example, the court discussed, at length, both "the nature and circumstances of the offense and the history and characteristics of the defendant" as required by § 3553(a)(1), describing Stokes as "a very intelligent man" with "multiple graduate degrees" and his conduct as "not only a crime but . . . a terribly serious moral offense." (Sentencing Tr., R. 311, at 80–81, *United States v. Stokes*, No. 07 CR 590, N.D. Ill.) Regarding the need for the sentence imposed, pursuant to § 3553(a)(2), the court cited "Stokes'[s] ability to escape from any more serious penalty for his previous conduct" and the fact that "Mr. Stokes doesn't feel the shame that any of us should when confronted with the evidence of our wrongdoing." (*Id.* at 83, 84.) Finally, the court referred to its "responsibility not to impose a sentence that's disproportionate to those experienced by persons engaged in similar activity," (*id.* at 84), consistent with § 3553(a)(6)'s requirement that courts consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

All of this evidences the court's meaningful consideration of the § 3553 factors and their applicability to Stokes at his sentencing. Thus, even if the § 3553 argument were properly before this court, the court would conclude that its statements at sentencing demonstrate fair treatment of § 3553 factors.

## III. Certificate of Appealability

The court denies a Certificate of Appealability on all claims. To receive a Certificate of Appealability, Stokes must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" exists only where "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to

proceed further.'" *Resendez v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The court's ruling in this case is not one that jurists of reason would find debatable.

## **CONCLUSION**

For the foregoing reasons, Stokes's motion under 28 U.S.C. § 2255 is denied, and the court declines to grant a Certificate of Appealability.  The motion for recusal [8] is also denied.

ENTER:

*[signature: Rebecca R. Pallmeyer]*

Dated: October 29, 2015  _____
REBECCA R. PALLMEYER
United States District Judge